## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **JOHN DOE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **23-11294-FDS** |
| **CITY OF BOSTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS TO DISMISS

**SAYLOR, C.J.**

This is a civil action arising out of the sexual abuse of young children by Patrick Rose Sr., a Boston police officer. In April 2022, Rose pleaded guilty to criminal charges including 21 counts of child rape and sexual assault on plaintiffs John and Jane Doe. The sexual abuse began in 1990, when John Doe was eight years old and Jane Doe was five years old.

Plaintiffs have filed suit against Patrick Rose, his wife Frances Rose, the City of Boston, the Boston Police Department, the Boston Police Patrolman's Association, the Massachusetts Department of Children and Families, and various individual government officials. The complaint asserts claims under 42 U.S.C. §§ 1983 and 1985 for violations of federal constitutional rights, as well as state-law statutory and common-law claims.

The essence of the complaint is set forth in the following introductory paragraphs:

> In 1995, twelve-year-old John Doe reported to the Boston Police Department ("BPD") that Rose had sexually abused him. Rose was arrested for Indecent Assault and Battery on a Child and placed on Administrative Leave. A Restraining Order was issued, and the Suffolk County District Attorney's Office filed a Criminal Complaint against Rose. The criminal case against Rose was later dismissed, purportedly because the victim was unwilling to testify.

The BPD Internal Affairs Division ("IAD") made a Complaint against Rose concerning the sexual assault charges and concluded that evidence existed and sustained the IAD Complaint.  After its investigation, the Department of Children and Families ("DCF") also concluded that Rose had sexually abused the minor.

Despite the sustained IAD Complaint, Boston Police Commissioner Paul Evans and the BPD did not discipline or terminate Rose.  Instead, after receiving pressure from the police patrolman's union and union attorney, Thomas Drechsler, Evans chose to reinstate Rose to full duty.

For the next 23 years, Rose worked as a police officer rising through the ranks of the BPD and the union, all the while continuing to sexually abuse John Doe.  Due to the complete failure of the BPD and DCF, Rose was not terminated from the police department, and avoided criminal charges, incarceration, restraining orders, therapy, and child custody restrictions.  Because the BPD and DCF did nothing, Rose was emboldened and escalated his abuse against John Doe and Jane Doe and extended the abuse to additional child victims.

(Compl. ¶¶ 2-5).

In substance, therefore, the complaint alleges not only that Rose sexually abused John and Jane for many years, but that multiple members of the BPD, the DCF, and the patrolman's union knew about the Rose's crimes and failed to do anything to prevent them.  Despite its disturbing content, however, the complaint suffers from a number of serious legal problems.

To begin, it was filed more than 25 years after the BPD's internal investigation and Rose's reinstatement to the force, and more than 20 years after the last alleged acts of abuse against plaintiffs.  That substantial interval raises a threshold issue as to whether the claims are barred by the relevant statutes of limitations.

For the reasons discussed below, there is a substantial likelihood that at least some claims are indeed time-barred.  Even so, the Court will not grant the motion to dismiss on that basis, as the question of when those claims accrued involves factual issues that would be better resolved on a complete evidentiary record.

A more fundamental problem is the viability of the federal constitutional claims under 42 U.S.C. §§ 1983 and 1985.  In substance, those claims allege that defendants violated plaintiffs' constitutional rights to due process of law under the Fourteenth Amendment.  For such a claim to be viable, plaintiffs must prove, among other things, that defendants were acting "under color of state law" when the injuries were inflicted—that is, that the injuries they suffered were inflicted by government action.

Although Patrick Rose was employed as a police officer at the time of his crimes, that alone is not enough to satisfy that requirement.  There is nothing in the complaint that suggests he was acting in an official capacity, or exercising his official responsibilities, at the times when he committed the acts of sexual abuse.  And Frances Rose, his wife, is not plausibly alleged to have been a government actor of any kind.

The remaining § 1983 defendants were in fact government employees, and are alleged to have acted within their official capacities when they failed to protect John and Jane.  According to the complaint, those failures "emboldened" Rose, causing the abuse to be both escalated and extended over a significant period.  (Compl. ¶ 5).  But as a general matter, the failure of government officials to protect individuals from private acts of violence does not violate the Fourteenth Amendment.  *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  There are only two exceptions to that general rule:  either where there is a "special relationship" between the state and the victim (for example, where a victim is a prisoner), or where a state actor affirmatively creates or enhances the danger to the victim.  *See J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010); *Irish v. Fowler*, 979 F.3d 65, 73 (1st Cir. 2020).

Unfortunately for plaintiffs, neither exception applies here.  The "special relationship" exception is clearly inapplicable.  The "state-created danger" exception, in turn, has specific

requirements that are not satisfied by the allegations in the complaint.  In simple terms, that exception requires proof of government *action* that creates or enhances a danger to a plaintiff, not government *inaction* that only fails to protect him from a danger posed by others.

The gravamen of the complaint is that the individual defendants turned a blind eye to Rose's sexual abuse, and did little or nothing to protect John or Jane despite knowing that Rose was assaulting them.  If true—and the Court must, for present purposes, assume that it is—that constitutes a dismaying pattern of neglect and dereliction of duty.  It may well give rise to one or more state-law claims.  But under principles established by the U.S. Supreme Court, such failures to act cannot sustain a federal constitutional claim.

Because the allegations in the complaint do not meet the requirements of a constitutional violation, the Court must dismiss the counts under 42 U.S.C. §§ 1983 and 1985 for failing to state a claim.  Doing so disposes of the federal claims, leaving only the claims arising under Massachusetts law.  Under the circumstances, the Court will decline to exercise its supplemental jurisdiction over those remaining claims, and will dismiss them without prejudice to their renewal in the Superior Court.  Whether plaintiffs have timely and otherwise viable state-law claims is a matter best left to the courts of the Commonwealth to resolve.

## I.   **Background**

Unless otherwise noted, the following facts are set forth as alleged in the amended complaint.[1]

---

[1] On March 19, 2024, plaintiffs moved to amend the original complaint to include the names of several previously unidentified DCF employees.  That motion has been granted, and all references will be to the amended complaint as submitted by plaintiffs.  (ECF No. 94-1).

A.    **Factual Background**

1.    **The Parties**

"John Doe" and "Jane Doe" are pseudonyms for two victims of sexual abuse committed by Patrick Rose Sr.  (Compl. ¶¶ 90-91).  "James Doe" is Jane's spouse.  (*Id.* ¶ 14).

John Doe was born in approximately 1982.  Rose abused John from 1990 until 1997, when he was between eight and fourteen years old.  (*Id.* ¶ 90).  At the time the complaint was filed, he was approximately 41 years old.

Jane Doe was born in approximately 1985.  Rose abused Jane from 1990 until 1999, when she was between five and fourteen years old.  (*Id.* ¶ 91).  At the time the complaint was filed, she was approximately 38 years old.

Patrick Rose Sr. was a police officer employed by the City of Boston between 1994 and 2018.  (*Id.* ¶ 58).  In 2022, he pleaded guilty to 21 counts of child rape and sexual assault against John and Jane Doe, among others.  (*Id.* ¶ 1).  According to the complaint, between at least 1990 and 2020 Rose also abused four other minors who were members of his family.  (*Id.* ¶ 92).

Frances Rose is Rose's spouse and John and Jane Doe's mother.  (*Id.* ¶ 61).

The City of Boston ("City") is a municipality located in Suffolk County, Massachusetts.  (*Id.* ¶ 15).  The Boston Police Department ("BPD") is a municipal agency of the City.  (*Id.* ¶ 16).

Paul Evans, Robert Dunford, Melbert Ahearn, Anne Marie Doherty, LaDonna Hatton, Eileen Vanderwood, John McLean, Anne Marie Donohue, and "BPD Defendant Does 1-5" (collectively, the "BPD defendants") are former BPD employees.  (*Id.* ¶¶ 17-54).  During the relevant time, Evans was the police commissioner; Dunford was Rose's district commander; Ahearn was the commander of the BPD Internal Affairs Division ("IAD"); Doherty was the superintendent-in-chief of the Office of Internal Investigation; Vanderwood was a detective in IAD; Hatton was a legal adviser; and Donahue and McLean were police officers.  (*Id.* ¶¶ 17-53).

The Massachusetts Department of Children and Families ("DCF") is a state agency.  (*Id.* ¶ 62).  Rudolph Adams, Raymond Smith, Sheryl Hilliard, Gail Sullivan, and "DCF Defendant Does 1-5" (collectively, the "DCF defendants") are former DCF employees.  (*Id.* ¶¶ 64-80).

The Boston Police Patrolman's Association ("BPPA") is a police union.[2]  Thomas Nee was the president of the BPPA from 1997 until 2014, and was a BPD officer.  (*Id.* ¶¶ 83-84).  "BPPA Defendant Does 1-5" were employees of BPPA.  (*Id.* ¶¶ 87-88).

### 2.  Initial Allegations and Investigation of Rose's Conduct

Rose began sexually abusing John and Jane Doe, along with four other minor victims, in approximately 1990.  (*Id.* ¶¶ 90-91).  According to the complaint, sometime in 1992, DCF became aware, or should have become aware, of a complaint that Rose had abused one of the other minor victims in the family home.  (*Id.* ¶ 99).

Rose became a Boston police officer in 1994.  (*Id.* ¶ 93).

In November 1995, DCF received a report that Rose had abused John.  (*Id.* ¶ 106).  The DCF defendants decided that the complaint should be investigated and assigned Raymond Smith to conduct that investigation.  (*Id.* ¶¶ 107-11).  Lieutenant Anne Marie Donahue and Sergeant Detective John McLean of the BPD Sexual Assault Unit were also assigned to investigate the allegation.  (*Id.* ¶ 116).

On November 10, 1995, Donahue and McLean interviewed John in front of his residence, who reported that Rose had sexually abused him.  (*Id.* ¶¶ 117-20).  He was then approximately 12 years old.  On the same day, the officers arrested Rose for indecent assault and battery on a child and prepared an incident report.  (*Id.* ¶¶ 121, 123).  A restraining order issued prohibiting

---

[2] The complaint incorrectly asserts that BPPA is a municipal entity.  (Compl. ¶ 81).

Rose from contacting John and Jane and two other minors.  (*Id.* ¶ 122).[3]  On the same day, Rose was placed on administrative duty by BPD.  (*Id.* ¶ 129).

Between November 13 and 16, 1995, DCF conducted witness interviews and concluded that the evidence supported the allegation that Rose had sexually abused John.  (*Id.* ¶¶ 138-39). BPD officers Donahue and McLean also continued their investigation by interviewing John's school principal and several of his friends.  (*Id.* ¶¶ 133-34).  Frances Rose told BPD officers that there had been a DCF investigation "3 or 4 years prior" into Rose's alleged abuse of a minor victim.  (*Id.* ¶ 101).  The same officers met with that victim the next day.  (*Id.* ¶ 102).

On November 16, 1995, six days after Rose's arrest, DCF referred the case to the Suffolk County District Attorney's Office.  (*Id.* ¶ 140).  Four days after that, Detective McLean applied for and received a criminal complaint against Rose for indecent assault and battery on a child under fourteen.  (*Id.* ¶ 154).  Rose was arraigned on that charge on December 1, 1995; he was represented by an attorney employed by the police union, the BPPA.  (*Id.* ¶¶ 156-57).

During his arraignment, Rose was placed on pretrial probation for one year.  (*Id.* ¶ 158). The court ordered Rose to participate in therapy directed by DCF.  (*Id.* ¶ 160).  He did not attend that therapy.  (*Id.* ¶ 167).  None of the defendants took any action regarding his failure to comply with the ordered therapy.  (*Id.* ¶¶ 161, 166, 168).  The restraining order was withdrawn by the end of January 1996, with DCF's consent.  (*Id.* ¶¶ 152, 169).

On May 7, 1996, the Commonwealth dismissed the criminal complaint.  (*Id.* ¶ 171).  That decision was based on Rose's purported compliance with the terms of his pretrial probation and the unwillingness of the victims to cooperate.  (*Id.*).

---

[3] Rose did not comply with that order.  (*Id.* ¶ 128).

### 3.      Internal Affairs Investigation and Reinstatement

Meanwhile, on December 19, 1995, Sergeant Detective Vanderwood of IAD prepared an internal complaint against Rose based on the criminal charges. (*Id.* ¶ 177). Six months later, and after the criminal charges had been dismissed, IAD interviewed Rose. (*Id.* ¶ 181). He asserted his Fifth Amendment privilege and refused to provide any information. (*Id.* ¶ 183).

On June 6, 1996, IAD sustained the complaint against Rose, citing a violation of a BPD internal rule that stated "[a]n employee of the Department who commits any criminal act shall be subject to disciplinary action up to and including discharge from the Department." (*Id.* ¶¶ 185-86). Detective Vanderwood reported to Commander Ahearn that her finding and recommendation that the IAD complaint against Rose was sustained, and Ahearn then notified Commissioner Evans. (*Id.* ¶¶ 193, 200). Between July and October 1996, Superintendent Doherty, attorney Hatton, and Commander Dunford were all notified that the IAD complaint had been sustained, but they did not sanction or terminate Rose. (*Id.* ¶ 229). None of those officials conducted any other review or investigation. (*Id.* ¶¶ 207-27).

On May 6, 1997, Thomas Drechsler, a BPPA attorney representing Rose, sent a letter to IAD requesting that he be returned to full duty. Attached to the letter were affidavits from John Doe and Frances Rose that denied any sexual misconduct by Rose. (*Id.* ¶¶ 230, 236).[4]

In October 1997, Alan Shapiro, another BPPA attorney, sent a second letter to Commissioner Evans informing him that BPPA was considering filing a grievance over Rose's continued restriction to administrative duty. That grievance was later filed. (*Id.* ¶¶ 237-38).

---

[4] The complaint alleges, albeit in general terms, that "John Doe's alleged recant" of his complaint was coerced by Patrick Rose. (*See* Compl. ¶ 375-80).

In May 1998, the City's Office of Labor Relations reported that it denied the grievance and that the BPD appropriately placed Rose on administrative duties.  (*Id.* ¶ 242).

Also in May 1998, Commissioner Evans reinstated Rose to full duty as a police officer.  (*Id.* ¶ 243).  Rose served as the president of BPPA from 2014 to 2018, and retired from the BPD in 2018.  (*Id.* ¶¶ 244-46).

### 4.   Renewed Complaint Against Rose and Criminal Prosecution

In 2020, John Doe again reported to the BPD that Rose had sexually abused him and two other victims.  (*Id.* ¶¶ 249-50).  By that point, John was in his late 30s.  Rose was charged with 33 counts of sexual abuse of John, Jane, and four other child victims.  (*Id.* ¶ 251).  On November 20, 2020, the grand jury for Suffolk County returned a 33-count indictment against Rose.  (*Id.* ¶¶ 252-53).  On April 25, 2022, Rose pleaded guilty to 21 counts of child rape and sexual assault.  (*Id.* ¶ 254).

### B.   Procedural Background

On June 8, 2023, plaintiffs John, Jane, and James Doe filed the initial complaint in this action.  An amended complaint was filed on March 19, 2024.  The amended complaint asserts 43 claims, which can be generally grouped into federal constitutional claims, state-law claims, and common-law tort claims.

Counts 1 through 15 assert federal constitutional claims.  Counts 1 through 10 allege claims under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment.  Counts 11 through 15 allege that the defendants engaged in a conspiracy to violate the Civil Rights Act under 42 U.S.C. § 1985.

Counts 16 through 20 allege claims under the Massachusetts Civil Rights Act ("MCRA") and Count 41 asserts a state-law statutory claim under Mass. Gen. Laws ch. 119, § 51A, contending that BPD and BPD defendants failed to report Rose's abuse to the authorities.

The remaining counts assert a variety of common-law tort claims.  Count 21 asserts a tort claim against Rose for sexual assault and battery.  Counts 22 through 30 assert a variety of negligence claims.  Counts 31 through 35 assert claims of intentional infliction of emotional distress.  Counts 36 through 40 assert claims of negligent infliction of emotional distress.  Count 42 alleges civil conspiracy against BPPA.  Count 43 alleges a loss of consortium by James Doe against all defendants.

On August 16, 2023, plaintiffs voluntarily dismissed the claims alleged directly against DCF, although the claims against the individual DCF defendants remained.

All the defendants, other than Patrick Rose and the recently named DCF defendants, have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief can be granted.

## II.   <u>Standard of Review</u>

On a motion to dismiss made pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under

some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   Analysis

### A.   Statute of Limitations

Defendants contend that all claims should be dismissed on the ground that they were brought outside the relevant limitation periods.  In their view, plaintiffs' claims accrued at the time of their abuse in the 1990s and the limitations period was tolled until John and Jane reached adulthood in 2001 and 2003, respectively.  But they contend that once the clock began to run, the applicable limitations period was three years, as set forth in Mass. Gen. Laws ch. 260, §§ 2A and 5B.  Thus, according to defendants, the limitation period expired in 2004 and 2006.

Plaintiffs contend that the applicable limitations period is set forth in Mass. Gen. Laws ch. 260, § 4C½.  That statute extends the limitation period for defendants who negligently supervised a person who sexually abused a minor until 35 years after the alleged acts occurred.  Alternatively, plaintiffs contend that under the discovery rule, the claims did not accrue until the public release of Rose's IAD file in June 2022.

### 1.   The Relevant Limitations Period

#### a.   Legal Framework

Under Massachusetts law, the general limitations period for tort claims is three years after the date of accrual.  *See* Mass. Gen. Laws ch. 260, § 2A ("Except as otherwise provided, actions of tort . . . shall be commenced only within three years next after the cause of action accrues."). Actions arising under the MCRA are similarly governed by a three-year statute of limitations. *See* Mass. Gen. Laws ch. 260, § 5B.

The relevant federal statutes, 42 U.S.C. §§ 1983 and 1985, do not include a limitations period; instead, courts apply the limitations period of the forum state.  *See Álamo-Hornedo v.*

*Puig*, 745 F.3d 578, 580 (1st Cir. 2014).  In Massachusetts, therefore, claims under §§ 1983 and 1985 are generally governed by Mass. Gen. Laws ch. 260, § 2A.  *Id.*

In 2014, the Massachusetts legislature amended Chapter 260 for cases involving sexual abuse of a minor.  The revised statute amended § 4C and enacted a new provision, § 4C½.  Both statutes extend the limitations period for cases involving sexual abuse of a minor to 35 years after the alleged abuse or 7 years after the victim "discovered or reasonably should have discovered" that a psychological injury was caused by that abuse.  Mass. Gen. Laws ch. 260, §§ 4C and 4C½.

Although similar, §§ 4C and 4C½ differ in at least two critical respects.  Section 4C applies specifically to claims "alleging the defendant sexually abused a minor," which the Supreme Judicial Court has interpreted to mean actual perpetrators.  *See Koe v. Mercer*, 450 Mass. 97, 100 n.8 (2007).  The statute also applies retroactively to any sexual abuse that occurred before its adoption.  *See* 2014 Mass. Acts ch. 145, § 8 (H.B. 4126); *Sliney v. Previte*, 473 Mass. 283, 291 (2015).

Section 4C½, by contrast, applies to claims "alleging that the defendant negligently supervised a person who sexually abused a minor or that the defendant's conduct caused or contributed to the sexual abuse of a minor by another person."  Mass. Gen. Laws ch. 260, § 4C½.  The 35-year period in § 4C½ was *not* given retroactive effect.  *See* 2014 Mass. Acts ch. 145, § 8 (H.B. 4126) (the 35-year period "shall be limited to all claims arising out of or based upon acts alleged to have caused an injury or condition to a minor which first occurred after the effective date of this act"); *Malouf v. Benson*, 2018 WL 10155427, at *3 n.7 (D. Mass. Aug. 23, 2018).  The 7-year period allowing for the discovery of psychological injury in § 4C½, however, was made retroactive.  *See* 2014 Mass. Acts ch. 145, § 8 (H.B. 4126).

### b.   **Analysis**

Although §§ 4C and 4C½ generally govern allegations of sexual abuse, neither provision

facially applies to the claims asserted against any of the defendants except Patrick Rose.  To the

extent that the complaint asserts claims against Patrick Rose, they are clearly timely under § 4C.

None of the other defendants, however, is alleged to be the direct perpetrator of sexual abuse,

meaning that § 4C does not apply to them.

As to § 4C½, neither limitations period applies.  The 35-year period does not apply;

again, that provision was not made retroactive, and the complaint alleges that Rose's abuse

against plaintiffs ended by 1999, fifteen years before the statute became effective.[5]  The 7-year

period also does not apply because the complaint does not allege that plaintiffs discovered that

"an emotional or psychological injury or condition was caused by" Rose's abuse within the last

seven years.  *See* Mass. Gen. Laws ch. 260, § 4C½.[6]

Accordingly, the appropriate limitations period for all of the claims at issue is three years

from the date of accrual under Mass. Gen. Laws ch. 260, §§ 2A and 5B.  The question then

becomes when those claims accrued.

### 2.   **Accrual**

### a.   **Legal Framework**

Unlike the limitations period, the date of accrual is governed by either federal or state

law, depending on the nature of the claim.  Both federal and state law, however, employ a similar

---

[5] Plaintiffs repeatedly assert that § 4C½ applies to their claims.  But it is beyond any reasonable dispute that the 35-year limitations period was not given retroactive effect in light of the legislature's clear statement to the contrary.  *See* 2014 Mass. Acts ch. 145, § 8 (H.B. 4126).

[6] Even were the Court to apply the 7-year limitations period, it would not appear to make a material difference.  If the accrual date is in 2022, as plaintiffs suggest, the default three-year period would not bar their claims; if it is in 2004 or 2006, as defendants suggest, the claims would be barred even under the 7-year period.

discovery rule; in substance, both provide that a claim does not accrue until a plaintiff knows or reasonably should know of both their injury and its causal connection to a defendant.

For the federal claims, the date of accrual is determined by federal law. *Ouellette v. Beaupre*, 977 F.3d 127, 135 (1st Cir. 2020). "[A] § 1983 claim will accrue once a plaintiff is armed with the necessary factual predicate to file suit, including knowledge of both an injury and the injury's likely causal connection with the putative defendant." *Id.* at 139. For § 1985 claims, the limitations period "runs separately from the occurrence of each civil rights violation that causes actual damage to the plaintiff (as long as the plaintiff knows or should have known of the injury)." *Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001).

Accrual of a federal claim does not occur "until the plaintiff knows, or should know . . . both the fact of his or her injury and the injury's likely causal connection with the putative defendant." *Ouelette*, 977 F.3d at 136. In some cases, "the injury may be apparent, but 'the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.'" *Id.* (quoting *Jardin De Las Catalinas Ltd. v. Joyner*, 766 F.3d 127, 133 (1st Cir. 2014)). Under those circumstances, the "federal discovery rule" delays accrual until "a reasonably prudent person similarly situated to the plaintiff would discover . . . the existence of the injury and its probable cause." *Id.*

However, if the available information would be sufficient to at least give rise to a suspicion of a claim, a prospective plaintiff has "a duty to investigate or inquire further regarding his or her injury and the party responsible for causing it." *Ouellette*, 977 F.3d at 137. "A claim will accrue at the point during an investigation when a plaintiff, acting diligently, obtained or would have obtained enough factual information about his or her injury and its cause to file suit against a defendant." *Id.* at 138.

For the state-law claims, "a tort cause of action accrues either when the plaintiff is injured as a result of the defendant's unlawful act or omission, or, if the wrong is inherently unknowable, when the plaintiff knows or should know that she has been injured." *Pagliuca v. City of Boston*, 35 Mass. App. Ct. 820, 824 (1994) (citations and quotations omitted). A plaintiff need not have "notice of every fact which must eventually be proved in support of the claim," but must have "knowledge that an injury has occurred." *Id.*

For MCRA claims, "the limitations period has been held to commence on the date of the allegedly wrongful acts, unless the wrong is 'inherently unknowable.'" *Id.* at 823 (quoting *Flynn v. Associated Press*, 401 Mass. 776, 781-82 (1988)). "A plaintiff need not know the extent or severity of the harm suffered. To start the limitations period a plaintiff need only have knowledge of all the facts necessary to make out his civil rights claim." *Arsenault v. Otto*, 628 F. Supp. 3d 377, 380 (D. Mass. Sept. 19, 2022).

### b.   Analysis

Again, defendants contend that all of the relevant claims accrued no later than 1998, when Rose was reinstated to full duty by the BPD, and then tolled until plaintiffs reached adulthood in 2004 and 2006. At that point, the three-year limitation periods began to run, and thus would have expired in 2007 and 2009. Plaintiffs contend, however, that they only learned of the predicate facts for their claims upon the release of Rose's IAD file in 2022.

The date that a claim accrues is a question of fact. *See Lawson v. Affirmative Equities Co.*, 341 F. Supp. 2d 51, 68 (D. Mass. 2004). A motion to dismiss may only be granted "when the pleader's allegations leave *no doubt* that an asserted claim is time-barred." *LaChapelle v. Berkshire Life Ins.*, 142 F.3d 507, 509 (1st Cir. 1998) (emphasis added). However, if "the complaint fails to sketch a factual predicate that would warrant the application of . . . a different

statute of limitations period . . . dismissal is appropriate." *Trans-Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (quotation omitted).

Here, the allegations in the complaint as to why the claims did not accrue until 2022 are threadbare at best.  Obviously, plaintiffs were not privy to the inner workings of the Boston Police Department in the 1990s, and it is at least plausible that they had no practical way of investigating certain claims against certain defendants until the release of the IAD file.  It is less obvious, however, that every claim, against every defendant, falls into that category; for example, it is unclear why the claims for common-law negligence, neglect, and abuse against Frances Rose, the mother of John and Jane, were inherently unknowable until 2022.

Nonetheless, the question of accrual—which, among other things, may vary substantially between different defendants and different claims—requires a factual inquiry of some complexity that is best resolved on a complete record.  Accordingly, the motions to dismiss will be denied to the extent defendants contend that the claims are barred by the relevant limitations period.  Whether all claims would survive summary judgment, once the factual record has been developed, is a question that need not be resolved at this stage.

**B.     Section 1983**

Counts 1 through 10 assert claims under 42 U.S.C. § 1983 against Patrick Rose, Frances Rose, the BPD and DCF defendants, and the City.  Each claim asserts violations of plaintiffs' Fourteenth Amendment due-process rights to "bodily integrity and to be free from deprivation of liberty without due process of law."  (*E.g.*, Compl. ¶ 321).  Defendants have moved to dismiss those claims, contending that the complaint fails to allege that Rose's abuse was attributable to government action, and thus cannot support a claim under § 1983.

1.      **The Constitutional Injury**

Section 1983 provides a private cause of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and [federal] laws." 42 U.S.C. § 1983. Claims under § 1983 have two essential elements: "[1] the defendant must have acted under color of state law, and [2] his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (2008). Proof of the second element requires a plaintiff to show that the defendant caused the alleged deprivation. *Id.*

As to the second element, the constitutional right at issue here is John and Jane Doe's right to bodily integrity, as secured through the Due Process Clause of the Fourteenth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 271-72 (1994).

However, not every harm committed by a government employee is a due-process violation. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) ("[W]e have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."). "That is because the purpose of the Due Process Clause is to protect the people from the state, not to ensure that the state protects them from each other." *Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

To establish a substantive due-process claim under § 1983, therefore, a plaintiff must prove two elements: (1) "a deprivation of a protected interest in life, liberty, or property," and (2) "that the deprivation of this protected right was caused by governmental conduct." *Rivera*, 402 F.3d at 33-34.

Here, the parties do not contest that the abuse suffered by John and Jane constitutes a deprivation of a constitutionally protected interest—specifically, their bodily integrity. *Albright*, 510 U.S. at 272.  Instead, they dispute whether that abuse was caused by government conduct.

The causation element is the "functional equivalent" of the requirement under § 1983 that the conduct at issue occur "under color of state law." *See Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 8 (1st Cir. 2015).  That element is "easily met when a government actor causes the injury, such as when police officers act under color of law." *Rivera*, 402 F.3d at 34.  But if "the person who inflicts the injury is a private person," there are only limited circumstances that the government's involvement with that person is enough to attribute their conduct to the government directly. *Id.* at 34-35.

Defendants submit that Patrick Rose was plaintiffs' direct abuser, and thus is the only relevant actor for the purposes of § 1983.  Plaintiffs contend that the complaint asserts claims directly against the other individual defendants, and that those individuals can be held responsible because of their own actions (and inactions).  The Court will consider the claims against each set of individual defendants in turn.

## 2.   **Patrick Rose**

There is no dispute that Patrick Rose was a police officer when he committed the acts of sexual abuse.  Defendants contend, however, that the complaint does not plausibly allege that Rose perpetrated that abuse in an official capacity—in other words, under color of state law—and thus does not state a predicate constitutional injury necessary to sustain a § 1983 claim.

To act "under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  In the First Circuit, "whether a police

officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995). "Such an evaluation requires an assessment of the totality of the surrounding circumstances[.]" *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 46 (1st Cir. 1999).

But "not every action undertaken by a person who happens to be a police officer is attributable to the state." *Martinez*, 54 F.3d at 986. "[A] policeman's private conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Id.* at 986-87. "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." *Id.* at 986; *see also Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 449 (1st Cir. 1997) ("[I]t is not enough for an individual merely to purport to exercise official power in order to trigger § 1983 liability, but rather the individual must actually be engaged in the abuse of official power granted by the government."). It is not sufficient to simply assert that an officer "acted under color of state law because but for his official authority, he could never have done what he did." *Parrilla-Burgos*, 108 F.3d at 449.

Here, the complaint contains no factual allegations that Patrick Rose ever abused John or Jane during the exercise of any official duties or that he did so in any official capacity. Instead, it simply asserts:

> At all relevant times, Rose was clothed with the authority of the state, exercised power possessed by virtue of state law, and misused power possessed by virtue of state law which was made possible only because Rose was clothed with the authority of state law.

(Compl. ¶ 374). But that statement alone—apart from repeating the legal requirement of state action—is not sufficient to allege that Rose was in fact acting under the color of state law during

his alleged abuse.  It effectively asserts that Rose could not have abused plaintiffs "but for" his position as a police officer.  But there are no plausible factual allegations to support that conclusion.  *See Barreto-Rivera*, 168 F.3d at 45 (such facts might include "a police officer's garb, an officer's duty status, the officer's use of a service revolver, [or] the location of the incident[s]"); *Sonia v. Town of Brookline*, 914 F. Supp. 2d 36, 43 (D. Mass. 2012) ("indicia of state action" can include whether "[o]fficers identified themselves as police" and whether they employed "police techniques and functions").  And a conclusory allegation is simply not enough to establish that Rose was engaged in state action when he committed the abuse.  *See Parrilla-Burgos*, 108 F.3d at 449.

While it might be supposed that Rose's employment as a police officer might have had a subjective effect on plaintiffs, such that they were more intimidated or frightened by him, the First Circuit has been clear that the "primary focus" of the analysis must be on objective conduct, not subjective impressions.  *Barreto-Rivera*, 168 F.3d at 47-48.  And if that were the standard, it would effectively mean that all police officers are always state actors, even when off-duty, which is not the law.

In sum, the complaint fails to plausibly allege that Patrick Rose was a government actor when he committed the wrongful acts.  He therefore did not act "under the color of state law" for § 1983 and Count 5 will be dismissed.[7]  Moreover, because Rose himself was not a government actor, his conduct alone cannot establish a constitutional violation sufficient to support the § 1983 claims against the other defendants.

---

[7] Under Fed. R. Civ. P. 12(h)(2), a party may raise a failure to state a claim in an answer.  Rose chose to file an answer in which he raised the affirmative defense to Count 5 that the complaint failed to state a claim upon which relief can be granted.  (ECF No. 62 at 33).  Thus, the sufficiency of the complaint on Count 5 is properly before the Court.

3.   **Frances Rose**

The complaint does not allege that Frances Rose was ever employed by the state. Instead, it alleges that she was a government actor for the purposes of § 1983 by participating in "joint activities" with Patrick Rose, the City, and the BPD defendants.  (Compl. ¶ 384).

Only in "rare circumstances" may a private party be deemed a government actor.  *See Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 6 (1st Cir. 2005).  To qualify, a defendant's actions must be "fairly attributable to the state."  *Id.* at 4 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  The Supreme Court has recognized three tests to determine whether a private party can be fairly characterized as a state actor:  the public-function test, the state-compulsion test, and the joint-action or "nexus" test.  *See Lugar*, 457 U.S. at 939; *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 18 (1st Cir. 1998).  Here, plaintiffs contend that Frances Rose may be considered a state actor under the joint-action test.

Under the joint-action test, a private party may be deemed a state actor if the "totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].'"  *Klunder v. Brown Univ.*, 778 F.3d 24, 31 (1st Cir. 2015) (alterations in original) (quoting *Estades-Negroni*, 412 F.3d at 5).

The complaint contains no plausible factual allegations to support the claim that Frances Rose was a government actor.  It does not allege that she ever was instructed by the government to do anything, nor that the state "insinuated" itself into any of her decision-making.  The bare assertion that she was a "joint participant" with other state actors is a conclusory statement, not a factual allegation, and thus cannot satisfy the joint-action test.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Accordingly, because the complaint does not plausibly allege that Frances Rose was a government actor, Count 6 will be dismissed.

### 4.   BPD and DCF Defendants

The complaint asserts that the other individual defendants—that is, the BPD and DCF defendants—were responsible in part for Rose's abuse because they failed to protect John and Jane.  There is no dispute that those defendants, unlike Patrick Rose and Frances Rose, were government actors who were performing their duties on behalf of the state.  However, because none of those defendants participated directly in the alleged sexual abuse, whether they committed a constitutional violation turns on whether their failure to protect John and Jane amounts to a due-process violation.

In general, "a [s]tate's failure to protect an individual against private violence simply does not constitute" a due-process violation.  *DeShaney*, 489 U.S. at 197; *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (holding that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause").  There are two exceptions to that general rule—the "special relationship" exception and the "state-created danger" exception.

### a.   "Special Relationship"

A government actor may be liable for failing to prevent a private violent act when there is a "special relationship" between the government actor and the victim.  *See J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010).  A special relationship is one in which "the [s]tate takes a person into its custody and holds him there against his will" and thus "by the affirmative exercise of [the state's] power so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney*, 489 U.S. at 199-200.  In those circumstances, the state's "subsequent failure to protect an individual may amount to a substantive due-process violation."  *Gloria*, 593 F.3d

at 79.  But that "affirmative duty to protect does not arise from the state's knowledge of the individual's predicament," only from the state's limitation of an individual's liberty.  *Id.*

Here, the complaint contains a single conclusory allegation that John and Jane "enjoyed a 'special relationship' with the state, as they were the subject victims in complaints to DCF[.]" (Compl. ¶ 396).  It does not allege any special relationship with the BPD defendants; that either victim was ever in the state's custody; that either was ever transferred to foster care; or that the state took any affirmative action to hold them against their will.  There are, therefore, no factual allegations that would support finding a "special relationship" between the individual defendants and John or Jane.

### b.   <u>"State-Created Danger"</u>

Government actors may also be responsible for harm inflicted by a private individual when the state creates or enhances the danger to the individual.  *Irish v. Fowler*, 979 F.3d 65, 73 (1st Cir. 2020) (citing *DeShaney*, 489 U.S. at 201).  The First Circuit has articulated four essential components necessary to ascribe a plaintiff's private harm to state actors:

(1)   that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;

(2)   that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;

(3)   that the act or acts caused the plaintiff's harm; and

(4)   that the state actor's conduct, when viewed in total, shocks the conscience.

*Id.* at 75.  An inability to establish any of those four elements is fatal to such a claim.  *Id.* Unfortunately for plaintiffs, the complaint here fails at the first step.

The complaint does not allege that the BPD or DCF defendants created the danger posed by Rose, but rather that they enhanced it by "embolden[ing]" him by failing to hold him accountable for his actions or to take steps to protect plaintiffs.  (Compl. ¶ 5).  For a government

actor to enhance an existing danger, courts generally consider whether the conduct placed the

victim in a "worse position" than they would have faced had the official "not acted at all."

*DeShaney*, 489 U.S. at 201; *see also Hayes v. Town of Dalton*, 2022 WL 488466, at *6 (D. Mass.

Feb. 17, 2022).  An act need not "greatly" enhance the danger, but must nonetheless enhance it

in some material way.  *See Welch v. City of Biddeford Police Dep't*, 12 F.4th 70, 76 (1st Cir.

2021).  A critical question is whether the government actor changed the course of events through

their own affirmative actions, rather than merely standing by and taking no action.  *Compare*

*Irish*, 979 F.3d at 68-71 (viable claim when police officers chose to contact a suspect despite

significant risk to a victim), *with Rivera*, 402 F.3d at 34-38 (no viable claim when officers did

nothing despite significant risks to victim).

Failing to protect or assist a victim is not an "affirmative" act for these purposes.  *See*

*Hayes*, 2022 WL 488466, at *7 (A "failure to provide assistance [to a threat] does not satisfy the

affirmative act element that is necessary to establish a state-created danger claim.").  Nor is

failing to report a suspected crime or failing to conduct an adequate investigation.  *See Johnson*

*v. City of Biddeford*, 92 F.4th 367, 378 (1st Cir. 2024) (finding that a police officer's "failure to

make various inquiries . . . may have been a serious misjudgment, but this failure was not an

affirmative action, and so is not sufficient on its own to establish unlawfulness under the state-

created danger doctrine"); *Rivera*, 402 F.3d at 37-38; *see also, e.g.*, *Pollard v. Georgetown Sch.*

*Dist.*, 132 F. Supp. 3d 208, 228 (D. Mass. 2015) ("Non-action, such as the 'failure to report' or a

'failure to investigate, or more generally to prevent,' is not enough" to allege an affirmative act)

(quoting *Doe v. Town of Bourne*, 2004 WL 1212075, at *8 (D. Mass. May 28, 2004)); *Hankey v.*

*Town of Concord-Carlisle*, 136 F. Supp. 3d 52, 70 (D. Mass. 2015) (no affirmative act when "the

conduct at issue [was] Defendants' inaction, including failure to effectively investigate,

intervene, and prevent harm to Plaintiff."); *Soto v. Flores*, 103 F.3d 1056, 1063-64 (1st Cir.
1997) ("In a creation of risk situation, where the ultimate harm is caused by a third party, courts
must be careful to distinguish between conventional torts and constitutional violations, as well as
between state inaction and action."); *Pena v. DePrisco*, 432 F.3d 98, 110 (2d Cir. 2005) ("A
failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a
state-created danger."); *Burella v. City of Philadelphia*, 501 F.3d 134, 147-48 (3d Cir. 2007)
("[The complaint] does not allege any facts that would establish that the officers did anything
other than fail to act.  That failure, while deeply troubling and unquestionably tragic, does not
give rise to a cognizable state-created danger claim.").

The critical question, therefore, is whether the complaint contains plausible factual
allegations that the BPD and DCF defendants engaged in affirmative conduct that enhanced the
danger to the children, as opposed to inaction that permitted the abuse to continue.

In *DeShaney* itself, a child named Joshua was repeatedly abused by his father.
*DeShaney*, 489 U.S. at 191-92.  A state agency knew about the possible abuse and had taken
some steps to protect Joshua, including obtaining a temporary court order to remove him from
his father's custody.  *Id.* at 192.  A "Child Protection Team," involving police officers, a doctor,
and social workers, eventually concluded that there was insufficient evidence of abuse to
maintain the court order.  *Id.*  That team recommended to the court that the order be dismissed,
and Joshua returned to his father's custody.  *Id.*  Over the next seven months, caseworkers
repeatedly saw that Joshua had sustained suspicious injuries, including multiple visits to an
emergency room, and yet took no action.  *Id.*  Two years after the initial complaint, Joshua was
beaten so severely that he fell into a coma and suffered permanent brain damage.  *Id.*  The
Supreme Court determined that the state's failure to protect Joshua did not rise to a constitutional

violation, in part because "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

In a more recent case, a seven-year-old girl died while living with her father (a police detective) and stepmother in Goodyear, Arizona. *Norwood v. Arizona Dep't of Child Safety*, 472 F. Supp. 3d 531, 533 (D. Ariz. 2020). The girl's mother brought a suit under § 1983 against the city of Goodyear, state officials from the Arizona Department of Child Safety ("ADCS"), and several city police officers. The complaint there alleged that the police officers and the ADCS officials received multiple calls to the girl's home to investigate signs of abuse or neglect. *Id.* On one occasion, an officer noted that the girl had visible injuries, including cuts, bruises, and wounds, and reported what he saw to the state agency. *Id.* The agency conducted no investigation or made any effort to determine whether abuse was occurring, nor removed the girl from her father's custody. *Id.* That complaint alleged that the defendants' inaction was due in part to the father's status as a police detective and that the absence of any further action by officials had "emboldened" him to keep abusing the child. *Id.* The court concluded, however, that the complaint failed to state a claim under § 1983 because, among other things, "the essential nature" of the claims was that the defendants had "abandoned their duty to conduct any type of investigation upon the third-party abuser," which was "properly considered inaction, rather than action." *Id.* at 539.

Other courts have confronted similar circumstances to those presented here and generally determined that inaction by state officials, even knowing of possible child abuse, cannot alone satisfy the affirmative conduct element of the theory. *See, e.g.*, *Pierce v. Delta Cnty. Dep't of Soc. Servs.*, 119 F. Supp. 2d 1139, 1151 (D. Colo. 2000) ("Defendants' alleged failure to report

and investigate credible charges of child abuse, while certainly indefensible, does not rise to the level of actionable constitutional malfeasance.  Rather, defendants' failure to act can best be described as nonfeasance, making this case indistinguishable from *DeShaney*."); *Johnson ex rel. Cano v. Holmes*, 377 F. Supp. 2d 1039, 1051 (D.N.M. 2004) (finding that a social worker had not affirmatively disregarded a child victim's safety by conducting an inadequate investigation), *aff'd*, 455 F.3d 1133 (10th Cir. 2006); *Estate of Pond v. Oregon*, 322 F. Supp. 2d 1161, 1167 (D. Or. 2004) (no affirmative conduct when a child was murdered after a state agency knew about possible child abuse, conducted a limited investigation, but ultimately took no action); *cf. Doe-1 v. Boston Pub. Schs.*, 2019 WL 1005498, at *4-5 (D. Mass. Mar. 1, 2019) (complaint plausibly alleged a § 1983 claim when school officials engaged in "affirmative acts of concealment and retaliation" by, among other things, actively impeding a DCF investigation by "suppressing and delaying" the filing of sexual assault reports concerning a student and "firing a teacher in retaliation" for filing such a report, leaving other students vulnerable to sexual assaults).

Here, as in *DeShaney* and *Norwood*, the core of the allegations against the BPD and DCF defendants is that they failed to protect John and Jane.  The complaint alleges plainly and directly that it was "[b]ecause the BPD and DCF *did nothing*" that Rose felt "emboldened" to escalate his abuse.  (Compl. ¶ 5).  It is replete with allegations that the individual defendants did not investigate further, conducted "inadequate" interviews, did not interview certain witnesses, did not enforce the restraining order, and did not inquire into the circumstances of the withdrawn 1995 complaint.  (*Id.*).  But inaction is not action.  The alleged conduct of the government officials here—grossly negligent or even reprehensible though it may have been—did not affirmatively enhance the danger faced by John and Jane.  It allowed it to continue, to be sure,

and may well have emboldened Rose, as the complaint alleges.  That is not, however, sufficient to establish a constitutional violation.

It is true that the complaint does assert some acts of affirmative conduct by the BPD and DCF defendants.  It alleges that BPD officers McLean and Donahue interviewed John in front of his residence in the presence of Patrick Rose.  (*Id.* ¶ 119).  They arrested Rose.  (*Id.* ¶ 121). Donahue told DCF not to go to Rose's house out of concern for John's safety.  (*Id.* ¶¶ 124-35). Someone at BPD placed Rose on administrative duty.  (*Id.* ¶ 129).  Some DCF personnel interviewed Jane.  (*Id.* ¶ 146).  Both BPD and DCF referred the case for criminal prosecution. (*Id.* ¶¶ 142, 155).  The DCF defendants consented to terminating Rose's restraining order (with which he was not complying).  (*Id.* ¶¶ 151-52).  Two BPD defendants approved of the end of the restraining order after the fact.  (*Id.* ¶ 170).  The BPD IAD investigators interviewed Rose and sustained the complaint against him.  (*Id.* ¶¶ 181-83).  Commissioner Evans reinstated Rose to full duty in 1998 despite the IAD complaint against him.  (*Id.* ¶ 243).[8]

But again, none of those actions created or enhanced the danger to John and Jane. Indeed, many were not wrongful in any meaningful sense; it was appropriate for BPD to conduct an investigation, conduct interviews, arrest Rose, and take steps toward suspending, terminating, and prosecuting him.  None of those actions is alleged to have materially changed Rose's behavior or any of the conditions of the sexual abuse.  None is alleged to have "enraged" Rose to commit more abuse.  *Cf. Irish*, 979 F.3d at 68-71.  And none was an affirmative act of "concealment and retaliation."  *Cf. Doe-1*, 2019 WL 1005498, at *4-5.

---

[8] The complaint also asserts in general terms, without any specific factual allegations, that the BPD and DCF defendants "worked in concert to cover-up Rose's sexual crimes."  (Compl. ¶ 135).

The two acts that may be most characterized as "affirmative" are the DCF's consent to the termination of the restraining order and Commissioner Evans's decision to return Rose to full duty. But both, in context, were effectively forms of inaction. As to the former, the complaint alleges that the DCF improperly failed to object to the termination of the restraining order, despite having good reason to do so (Rose had not attended his court-ordered therapy sessions). As to the latter, the complaint alleges that Evans allowed the reinstatement process to run its course, without attempting to take further steps to investigate or prevent Rose's return to the force.[9] But there are no facts from which to infer the next and vital step—that either of those two acts changed Rose's conduct such that it enhanced the danger to John and Jane. Without that step, there can be no state-created danger.[10]

In sum, the complaint does not allege any affirmative conduct by the BPD or DCF defendants sufficient to rise to the level of a constitutional violation. It therefore does not state a claim under § 1983 because the harm, however severe it may have been, was not caused by any government actor. Accordingly, the remaining counts under § 1983 will be dismissed.[11]

---

[9] There is also no allegation in the complaint as to what Commissioner Evans knew, or reasonably should have known, when he took that action beyond the fact that IAD had sustained a complaint against Rose. (Compl. ¶ 176). That complaint, as alleged here, cited to an internal BPD rule that prohibits officers from engaging in criminal acts. (Id. ¶¶ 162-63). The criminal action against Rose, however, had been dismissed in May 1996, two years before Evans's decision. (Id. ¶¶ 147, 219).

[10] The Court also notes that even if those two affirmative acts could be inferred to have enhanced the danger to plaintiffs, there are no specific factual allegation to infer that they *caused* any of the alleged abuse. *See Irish*, 979 F.3d at 75.

[11] Although the DCF defendants have not moved to dismiss the complaint, "[w]hen one defendant files a motion to dismiss under 12(b)(6), the Court may consider the sufficiency of the complaint as against all other defendants." *D'Amario v. Russo*, 718 F. Supp. 118, 124 (D.R.I. 1989) (citing *Diaz v. Stathis*, 440 F. Supp. 634 (D. Mass. 1977), *aff'd*, 576 F.2d 9 (1st Cir. 1978)). The essential defect in the complaint here applies equally to both the BPD and DCF defendants.

   5.      **The City**

A municipality may not be held vicariously liable under § 1983 for the acts of its employees.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  But a municipality may be directly liable for its failure to train or supervise its employees when that failure "causes a constitutional violation or injury" and "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact."  *DiRico v. City of Quincy*, 404 F.3d 464, 468 (1st Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

That said, *Monell* permits the imposition of municipal liability "*only* for underlying, identifiable constitutional violations attributable to official municipal policy; the municipality's failure to train or supervise its police officers only becomes a basis for liability when 'action pursuant to official municipal policy some nature caused a constitutional tort.'"  *Kennedy v. Town of Billerica*, 617 F.3d 520, 531-32 (1st Cir. 2010) (quoting *Monell*, 436 U.S. at 691, 98) (emphasis added); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Evans v. Avery*, 100 F.3d 1033, 1039-40 (1st Cir. 1996) ("[W]e follow *Heller*'s clear rule and hold that the [c]ity cannot be held liable absent a constitutional violation by its officers.").

Here, because the complaint does not state an underlying constitutional violation by any City employee, the § 1983 claims against the City will also be dismissed.

   C.      **Section 1985**

Counts 11 through 15 of the complaint assert claims under 42 U.S.C. § 1985.  Section 1985 prohibits conspiracy to interfere with civil rights by (1) preventing an officer from performing their duties, (2) obstructing justice by intimidating a party, witness, or juror, or

(3) depriving a person of their legal rights or privileges.  42 U.S.C. § 1985.  Although the

complaint here does not specify under which subsection it purports to assert the claims, it

contains language that would seem to suggest both §§ 1985(2) and 1985(3).

To allege a § 1985 conspiracy, the complaint must plead that (1) two or more individuals

acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means; (2) an

agreement between the individuals to inflict an injury upon him, and (3) an overt act that results

in damages.  *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988).  Thus, for a § 1985 conspiracy to

be actionable, like a § 1983 claim, it must have resulted in an "actual deprivation of a right

secured by the Constitution and Laws."  *Id.*; *Brennan v. Hendrigan*, 888 F.2d 189, 195 (1st Cir.

1989).  Here, as discussed, the complaint fails to allege any facts that suggest that plaintiffs have

suffered a constitutional deprivation.

Sections 1985(2) and 1985(3) also both require the complaint to plead that a race- or

class-based discriminatory motive lies behind the alleged conspirators' actions.  *See Kush v.

Rutledge*, 460 U.S. 719, 725-26 (1983) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 91 (1971)).

There are no facts that John or Jane is a member of a protected class or has suffered class-based

discrimination.[12]

Finally, the complaint does not plausibly allege with specificity any facts that, if proved,

would amount to a conspiracy, or how defendants acted in concert to deprive John or Jane of

their civil rights.  *See Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019) ("A complaint containing

only vague and conclusory allegations of a conspiracy fails to state a plausible claim under

---

[12] Plaintiffs assert that they belong to a "narrow class" including "victims of BPD's internal cover-up of
BPD misconduct in the 1990s."  (ECF No. 63 at 19).  However, "not all clearly defined classes [are] covered by the
statute."  *Perez-Sanchez v. Public Bldg. Auth.*, 531 F.3d 104, 108 (1st Cir. 2008).  More importantly, the "complaint
must allege facts showing that the defendants conspired against the plaintiffs *because of* their membership in a class
and that the criteria defining the class were invidious."  *Strahan v. Frazier*, 156 F. Supp. 2d 80, 102 (D. Mass. 2001)
(emphasis added).  Plaintiffs' proposed "class" is clearly outside the scope of § 1985.

§ 1985."); *see also Twombly*, 550 U.S. at 555 (a plaintiff's obligation under Fed. R. Civ. P. 8(a) to provide the grounds of his claim "requires more than labels and conclusions").

Accordingly, the claims arising under § 1985 will be dismissed for failing to state a claim upon which relief can be granted.

### D.   <u>Supplemental Jurisdiction</u>

The Court will decline to exercise supplemental jurisdiction over the remaining claims in light of its dismissal of the federal claims.  If a complaint fails to state a viable claim under federal law and jurisdiction over the remaining claims depends solely on supplemental jurisdiction, 28 U.S.C. § 1367, a "district court has discretion to decline to exercise supplemental jurisdiction." *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010); 28 U.S.C. § 1367(c).  In so doing, the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity." *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012); *see Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) ("[I]t can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts.").

Here, plaintiffs' remaining claims arise under Massachusetts state law.  Counts 16 through 20 state claims under the MCRA; Count 41 states a claim under Mass. Gen. Laws ch. 119, § 51A; and the remaining counts state common-law tort claims.  The question of whether the claims are barred by the statute of limitations also presents an issue of state law.  Apart from the complaint and motions to dismiss, no substantial litigation has occurred.

Under the circumstances, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims.  As noted, the question of whether plaintiffs have viable state-law claims is properly addressed to the state courts.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, defendants' motions to dismiss are GRANTED as to Counts 1 through 15.  The Court declines to exercise supplemental jurisdiction over the remaining claims, and those claims are DISMISSED without prejudice to their renewal in the state court.  The Clerk is instructed to enter a separate order of dismissal.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Dated:  March 29, 2024                       Chief Judge, United States District Court