**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **JOHN DOE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **23-11294-FDS** |
| **CITY OF BOSTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTIONS TO DISMISS**

**SAYLOR, J.**

This is a civil action arising out of the sexual abuse of young children by Patrick Rose Sr., a Boston police officer, and the alleged failure of various city, state, and union officials to stop the abuse.  In April 2022, Rose pleaded guilty to criminal charges including 21 counts of child rape and sexual assault on plaintiffs John and Jane Doe.  The sexual abuse began in 1990, when John Doe was eight years old and Jane Doe was five years old.

Plaintiffs have filed suit against Patrick Rose, his wife Frances Rose, the City of Boston, the Boston Police Department, the Boston Police Patrolman's Association, the Massachusetts Department of Children and Families, and various individual government officials.  The complaint asserts claims under 42 U.S.C. §§ 1983 and 1985 for violations of federal constitutional rights, as well as state-law statutory and common-law claims.

There is no question that the conduct of Patrick Rose was horrifying in the extreme. Furthermore, if the allegations in the complaint are true, a large number of individuals who could have attempted to intervene to protect the children failed to do so.  Nonetheless, the question for

present purposes is not whether any of the defendants acted in a morally reprehensible way, but whether the complaint states a claim for violation of federal law.

In an earlier opinion, the Court dismissed all of the federal-law claims and declined to exercise supplemental jurisdiction over the state-law claims. *See Doe v. City of Boston*, 2024 WL 1346018 (D. Mass. Mar. 29, 2024). The Court dismissed the § 1983 claims on the ground that the complaint failed to allege any affirmative acts taken by defendants that enhanced the danger plaintiffs faced from Rose, as necessary to state a claim for a Fourteenth Amendment substantive-due-process violation. *See id.* at *12-16. On appeal, the First Circuit vacated the Court's decision as to the § 1983 claims against the BPD and DCF defendants, as well as the City of Boston, and affirmed the Court's dismissal of the § 1985 claim. *See Doe v. City of Boston*, 145 F.4th 142, 158 (1st Cir. 2025). The Court of Appeals found that the complaint plausibly alleged three affirmative acts taken by the BPD defendants that could form the basis for a Fourteenth Amendment violation: "(1) Sgt. Det. McLean and Lt. Donahue's decision to interview John in front of Rose, his abuser; (2) Lt. Donahue's instruction to DCF not to visit Rose's home or reinterview John; [and] (3) Superintendent-in-Chief Doherty and Legal Advisor Hatton's approval of vacating the restraining order against Rose." *Id.* at 150.[1] The Court of Appeals also vacated the dismissal of the claims against the DCF defendants, as well as the claim against the City under a theory of municipal liability. *Id.* at 156.

Although the Court of Appeals found that the complaint sufficiently alleges several affirmative acts by the defendants, there are still several additional hurdles the complaint must clear to state a viable state-created danger claim under § 1983. The complaint must satisfy the

---

[1] The Court of Appeals also addressed "Commissioner Evans's decision to reinstate Rose to full duty" and found the complaint did not sufficiently allege that action had caused any additional or worse abuse to John or Jane. *See Doe*, 145 F.4th at 155-56.

2

remaining prongs of the state-created danger exception: it must adequately allege "that the act or acts caused the plaintiff's harm" and that "the state actor's conduct, when viewed in total, shocks the conscience." *See Doe*, 145 F.4th at 151.[2] And even if the complaint makes out a *prima facie* claim, it must overcome defendants' qualified immunity by showing that it "was 'clearly established' at the time of the defendant[s'] claimed misconduct" that their actions represented a constitutional violation. *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018).

For the following reasons, the Court concludes that the complaint states a claim for violation of plaintiffs' substantive-due-process rights under the state-created danger theory and, at least based on the allegations of the complaint, those claims are not barred by qualified immunity. Furthermore, the complaint states a claim against the City of Boston based on its allegations that the City had a custom of inadequately investigating incidents of police misconduct.

## I.    **Background**

Unless otherwise noted, the following facts are set forth as alleged in the amended complaint, and as summarized in the Court's earlier decision.

### A.    **Factual Background**

#### 1.    **The Parties**

"John Doe" and "Jane Doe" are pseudonyms for two victims of sexual abuse committed by Patrick Rose Sr. (Am. Compl. ¶¶ 90-91). "James Doe" is Jane's spouse. (*Id.* ¶ 14).

John Doe was born in approximately 1982. Rose abused John from 1990 until 1997,

---

[2] In its opinion, the First Circuit appears to have addressed the third prong of the state-created danger standard (that is, the causation prong) and found it met as to the three affirmative acts addressed below. *See Doe*, 145 F.4th at 151-52. Nonetheless, the parties contested the third prong in their briefs. Therefore, in order to avoid any ambiguity, the Court will address the issue as well.

when he was between eight and fourteen years old. (*Id.* ¶ 90). At the time the complaint was filed, he was approximately 41 years old.

Jane Doe was born in approximately 1985. Rose abused Jane from 1990 until 1999, when she was between five and fourteen years old. (*Id.* ¶ 91). At the time the complaint was filed, she was approximately 38 years old.

Patrick Rose Sr. was a police officer employed by the City of Boston between 1994 and 2018. (*Id.* ¶ 58). In 2022, he pleaded guilty to 21 counts of child rape and sexual assault against John and Jane Doe, among others. (*Id.* ¶ 1). According to the complaint, between at least 1990 and 2020 Rose also abused four other minors who were members of his family. (*Id.* ¶ 92).

Frances Rose is Rose's spouse and John and Jane Doe's mother. (*Id.* ¶ 61).

The City of Boston ("City") is a municipality located in Suffolk County, Massachusetts. (*Id.* ¶ 15). The Boston Police Department ("BPD") is a municipal agency of the City. (*Id.* ¶ 16).

Paul Evans, Robert Dunford, Melbert Ahearn, Anne Marie Doherty, LaDonna Hatton, Eileen Vanderwood, John McLean, Anne Marie Donohue, and "BPD Defendant Does 1-5" (collectively, the "BPD defendants") are former BPD employees. (*Id.* ¶¶ 17-54). During the relevant time, Evans was the police commissioner; Dunford was Rose's district commander; Ahearn was the commander of the BPD Internal Affairs Division ("IAD"); Doherty was the superintendent-in-chief of the Office of Internal Investigation; Vanderwood was a detective in IAD; Hatton was a legal adviser; and Donahue and McLean were police officers. (*Id.* ¶¶ 17-53).

The Massachusetts Department of Children and Families ("DCF") is a state agency. (*Id.* ¶ 62). Rudolph Adams, Raymond Smith, Sheryl Hilliard, Gail Sullivan, and "DCF Defendant Does 1-5" (collectively, the "DCF defendants") are former DCF employees. (*Id.* ¶¶ 64-80).

4

The Boston Police Patrolman's Association ("BPPA") is a police union.[3]  Thomas Nee was the president of the BPPA from 1997 until 2014, and was a BPD officer.  (*Id.* ¶¶ 83-84).  "BPPA Defendant Does 1-5" were employees of BPPA.  (*Id.* ¶¶ 87-88).

### 2.    Initial Allegations and Investigation of Rose's Conduct

Rose began sexually abusing John and Jane Doe, along with four other minor victims, in approximately 1990.  (*Id.* ¶¶ 90-91).  According to the complaint, sometime in 1992, DCF became aware, or should have become aware, of a complaint that Rose had abused one of the other minor victims in the family home.  (*Id.* ¶ 99).

Rose became a Boston police officer in 1994.  (*Id.* ¶ 93).

In November 1995, DCF received a report that Rose had abused John.  (*Id.* ¶ 106).  The DCF defendants decided that the complaint should be investigated and assigned Raymond Smith to conduct that investigation.  (*Id.* ¶¶ 107-11).  Lieutenant Anne Marie Donahue and Sergeant Detective John McLean of the BPD Sexual Assault Unit were also assigned to investigate the allegation.  (*Id.* ¶ 116).

On November 10, 1995, Donahue and McLean interviewed John in front of his residence, who reported that Rose had sexually abused him.  (*Id.* ¶¶ 117-20).  He was then approximately 12 years old.  On the same day, the officers arrested Rose for indecent assault and battery on a child and prepared an incident report.  (*Id.* ¶¶ 121, 123).  A restraining order issued prohibiting Rose from contacting John and Jane and two other minors.  (*Id.* ¶ 122).[4]  On the same day, Rose was placed on administrative duty by BPD.  (*Id.* ¶ 129).

Between November 13 and 16, 1995, DCF conducted witness interviews and concluded

---

[3] The complaint incorrectly asserts that BPPA is a municipal entity.  (Am. Compl. ¶ 81).

[4] Rose did not comply with that order.  (*Id.* ¶ 128).

that the evidence supported the allegation that Rose had sexually abused John.  (*Id.* ¶¶ 138-39).

BPD officers Donahue and McLean also continued their investigation by interviewing John's

school principal and several of his friends.  (*Id.* ¶¶ 133-34).  Frances Rose told BPD officers that

there had been a DCF investigation "3 or 4 years prior" into Rose's alleged abuse of a minor

victim.  (*Id.* ¶ 101).  The same officers met with that victim the next day.  (*Id.* ¶ 102).

On November 16, 1995, six days after Rose's arrest, DCF referred the case to the Suffolk

County District Attorney's Office.  (*Id.* ¶ 140).  Four days after that, Detective McLean applied

for and received a criminal complaint against Rose for indecent assault and battery on a child

under fourteen.  (*Id.* ¶ 154).  Rose was arraigned on that charge on December 1, 1995; he was

represented by an attorney employed by the police union, the BPPA.  (*Id.* ¶¶ 156-57).

During his arraignment, Rose was placed on pretrial probation for one year.  (*Id.* ¶ 158).

The court ordered Rose to participate in therapy directed by DCF.  (*Id.* ¶ 160).  He did not attend

that therapy.  (*Id.* ¶ 167).  None of the defendants took any action regarding his failure to comply

with the ordered therapy.  (*Id.* ¶¶ 161, 166, 168).  The restraining order was withdrawn by the

end of January 1996, with DCF's consent.  (*Id.* ¶¶ 152, 169).

On May 7, 1996, the Commonwealth dismissed the criminal complaint.  (*Id.* ¶ 171).  That

decision was based on Rose's purported compliance with the terms of his pretrial probation and

the unwillingness of the victims to cooperate.  (*Id.*).

### 3.    <u>Internal Affairs Investigation and Reinstatement</u>

Meanwhile, on December 19, 1995, Sergeant Detective Vanderwood of IAD prepared an

internal complaint against Rose based on the criminal charges.  (*Id.* ¶ 177).  Six months later, and

after the criminal charges had been dismissed, IAD interviewed Rose.  (*Id.* ¶ 181).  He asserted

his Fifth Amendment privilege and refused to provide any information.  (*Id.* ¶ 183).

On June 6, 1996, IAD sustained the complaint against Rose, citing a violation of a BPD internal rule that stated "[a]n employee of the Department who commits any criminal act shall be subject to disciplinary action up to and including discharge from the Department." (*Id.* ¶¶ 185-86). Detective Vanderwood reported to Commander Ahearn that her finding and recommendation that the IAD complaint against Rose was sustained, and Ahearn then notified Commissioner Evans. (*Id.* ¶¶ 193, 200). Between July and October 1996, Superintendent Doherty, attorney Hatton, and Commander Dunford were all notified that the IAD complaint had been sustained, but they did not sanction or terminate Rose. (*Id.* ¶ 229). None of those officials conducted any other review or investigation. (*Id.* ¶¶ 207-27).

On May 6, 1997, Thomas Drechsler, a BPPA attorney representing Rose, sent a letter to IAD requesting that he be returned to full duty. Attached to the letter were affidavits from John Doe and Frances Rose that denied any sexual misconduct by Rose. (*Id.* ¶¶ 230, 236).[5]

In October 1997, Alan Shapiro, another BPPA attorney, sent a second letter to Commissioner Evans informing him that BPPA was considering filing a grievance over Rose's continued restriction to administrative duty. That grievance was later filed. (*Id.* ¶¶ 237-38). In May 1998, the City's Office of Labor Relations reported that it denied the grievance and that the BPD appropriately placed Rose on administrative duties. (*Id.* ¶ 242).

Also in May 1998, Commissioner Evans reinstated Rose to full duty as a police officer. (*Id.* ¶ 243). Rose served as the president of BPPA from 2014 to 2018, and retired from the BPD in 2018. (*Id.* ¶¶ 244-46).

---

[5] The complaint alleges, albeit in general terms, that "John Doe's alleged recant" of his complaint was coerced by Patrick Rose. (*See* Am. Compl. ¶ 375-80).

### 4.      Renewed Complaint Against Rose and Criminal Prosecution

In 2020, John Doe again reported to the BPD that Rose had sexually abused him and two other victims.  (*Id.* ¶¶ 249-50).  By that point, John was in his late 30s.  Rose was charged with 33 counts of sexual abuse of John, Jane, and four other child victims.  (*Id.* ¶ 251).  On November 20, 2020, the grand jury for Suffolk County returned a 33-count indictment against Rose.  (*Id.* ¶¶ 252-53).  On April 25, 2022, Rose pleaded guilty to 21 counts of child rape and sexual assault.  (*Id.* ¶ 254).

### B.      Procedural Background

On June 8, 2023, plaintiffs John, Jane, and James Doe filed the initial complaint in this action.  An amended complaint was filed on March 19, 2024.  The amended complaint asserts 43 claims, which can be generally grouped into federal constitutional claims, state-law claims, and common-law tort claims.

Counts 1 through 15 assert federal constitutional claims.  Counts 1 through 10 allege claims under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment.  Counts 11 through 15 allege that the defendants engaged in a conspiracy to violate the Civil Rights Act under 42 U.S.C. § 1985.

Counts 16 through 20 allege claims under the Massachusetts Civil Rights Act ("MCRA") and Count 41 asserts a state-law statutory claim under Mass. Gen. Laws ch. 119, § 51A, contending that BPD and BPD defendants failed to report Rose's abuse to the authorities.

The remaining counts assert a variety of common-law tort claims.  Count 21 asserts a tort claim against Rose for sexual assault and battery.  Counts 22 through 30 assert a variety of negligence claims.  Counts 31 through 35 assert claims of intentional infliction of emotional distress.  Counts 36 through 40 assert claims of negligent infliction of emotional distress.

Count 42 alleges civil conspiracy against BPPA.  Count 43 alleges a loss of consortium by James Doe against all defendants.

On March 29, 2024, the Court granted defendants' motions to dismiss the federal claims and declined to exercise supplemental jurisdiction over the state-law claims.  On July 25, 2025, the Court of Appeals reversed the Court's decision as to the § 1983 claims under the state-created danger theory and otherwise affirmed.

Following remand, the parties filed supplemental briefs as to the remaining claims asserting violation of federal law.  In accordance with the direction of the Court at a conference on August 12, 2025, the parties did not file supplemental briefs addressing the state-law claims pending resolution of the issue of a viable federal claim.

## II.    Standard of Review

On a motion to dismiss made pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico*

9

*del Turabo Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

**III.     Analysis**

     **A.     State-Created Danger Claims**

As a general matter, "a [s]tate's failure to protect an individual against private violence simply does not constitute" a due-process violation. *Doe v. City of Boston*, 145 F.4th 142, 151 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (holding that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause"). "But when the state creates or enhances the danger to an individual from that private violence, then a due process claim may be available." *Doe*, 145 F.4th at 151.

To state such a claim, a plaintiff must show:

(1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;

(2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;

(3) that the act or acts caused the plaintiff's harm; and

(4) that the state actor's conduct, when viewed in total, shocks the conscience.

(i) Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.

(ii) Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

*Id.* (quoting *Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020)).

10

### 1. BPD Defendants

On appeal, the First Circuit held that the complaint alleges at least three affirmative acts that could form the basis for a state-created danger claim:  (1) the interview of John by Lt. Donahue and Sgt. Det. McLean in a police car in view of Patrick Rose; (2) the instruction of Lt. Donahue to employees of DCF not to visit the Roses' home; and (3) the approval by Doherty and Hatton of vacating the restraining order against Patrick Rose.  In light of that decision, the parties agree that those acts meet the first and second elements of a claim under the state-created danger doctrine.  (Dkt. No. 119 at 5; Dkt. No. 127 at 4).  What remains are the third and fourth elements—that is, whether those affirmative acts caused additional harm to John and Jane Doe and whether defendants' conduct shocks the conscience.  *See Doe*, 145 F.4th at 155.

### a. Interview with John Doe

The complaint alleges that on November 10, 1995, Lt. Donahue and Sgt. Det. McLean interviewed John Doe about the abuse by Patrick Rose in a police car in front of the Roses' house, while Patrick and Frances Rose were standing outside.  (Am. Compl. ¶¶ 117-19).  As alleged, that suffices to state a claim for a Fourteenth Amendment substantive due-process violation under the state-created danger theory.

First, the complaint adequately alleges that defendants' conducting the interview in this manner caused John Doe to suffer more harm from Rose than he otherwise would have.  "To make out a state-created danger claim, a 'plaintiff must show that the defendant's actions were both the but-for and proximate cause of his or her injury.'"  *Hewes v. Pangburn*, 162 F.4th 177, 194 (1st Cir. 2025).  The complaint specifically alleges that this act, among others, "created and enhanced a dangerous and unsafe situation to [p]laintiffs and caused them to be sexually assaulted."  (Am. Compl. ¶ 360).  And the First Circuit's analysis suggests that such an allegation is plausible:  the court noted that "[a] jury could find that conducting the interview in this way,

11

despite other potential options, was wrongful precisely because doing so would foreseeably 'increase the child's risk of further abuse.'" *Doe*, 145 F.4th at 153 (quoting *Lipman v. Budish*, 974 F.3d 726, 746 (6th Cir. 2020)) (citation modified).

Second, defendants' alleged actions at least plausibly shock the conscience. "To shock the conscience, the state action must be both egregious and outrageous." *Hewes*, 162 F.4th at 194. "Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience." *Irish*, 979 F.3d at 75. "To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk." *Id.*

Here, Lt. Donahue and Sgt. Det. McLean had the opportunity to make "unhurried judgments." Although the complaint alleges that they interviewed John Doe on the same day they were assigned to the case, it does not allege that they were compelled to do so by exigent circumstances requiring a split-second decision, without opportunity for reflection. (Am. Compl. ¶¶ 116-17). Accordingly, allegations that defendants acted with deliberate indifference are sufficient, for present purposes, to allege behavior that shocks the conscience.

And the complaint does adequately allege that defendants acted with deliberate indifference to the substantial risk that interviewing John Doe in front of Rose would lead to his suffering additional harm. There are no allegations that the defendants considered interviewing John Doe in another location, such as at his school, and the complaint specifically alleges, albeit in general terms, that by doing so the defendants acted with "deliberate indifference of [p]laintiffs' substantive due process rights." (Am. Compl. ¶ 362).

Accordingly, the allegations involving Lt. Donahue and Sgt. Det. McLean's interview of John Doe are sufficient to state a claim for a substantive due-process violation under the state-

created danger theory.

### b.        Instruction to DCF

The complaint further alleges that on November 10, 1995, Lt. Donahue instructed employees of DCF "not to go to the Rose home, as the allegation pertained to a Boston Police officer." (Am. Compl. ¶ 124). The next two sentences of the complaint provide the alleged context in which that instruction was given: "Donahue advised that she would go to the Rose home, to avoid any harm to the child or family members where Rose had a gun and may become angry with the family, including John Doe. Donahue stated to DCF Defendants that she was concerned that Rose may react in a hostile way. Donahue advised that John Doe should not be interviewed again, despite investigation protocols stating otherwise." (*Id.* ¶¶ 124-25).

Based on the totality of those allegations, it is far from clear that the decision by Lt. Donahue demonstrated deliberate indifference to potential harm to the victims, much less a higher state of mental culpability. On its face, the allegations in the complaint appear to indicate that she considered the likely impact of a DCF investigation on the safety of the children and made a decision that she thought would benefit them. Even if that decision was mistaken, and caused additional harm to befall the plaintiffs, that may not rise to the level of deliberate indifference. *See Irish*, 979 F.3d at 75.

In their opposition to the motion to dismiss, plaintiffs contend that the characterization of Lt. Donahue's instruction as being intended to protect the children is "absurd, disingenuous, and inconsistent with the First Circuit's decision." (Dkt. No. 127 at 11). It is true that the First Circuit concluded that "it is reasonable to infer from the Does' allegations that the BPD instruction was wrongful given that it focused on Rose's status as a police officer: Lt. Donahue instructed DCF not to undertake these steps because 'the [sexual abuse] allegation pertained to a Boston Police officer.'" *Doe v. City of Boston*, 145 F.4th 142, 154 n.9 (1st Cir. 2025). But the

court did not address the remaining allegations of paragraph 124 and paragraph 125, which set forth the alleged reason for Lt. Donahue's action. Whether that omission has any legal significance is unclear.

In any event, under the circumstances, the Court will take the allegation of the first sentence of paragraph 124 of the amended complaint at face value, and independently of the ensuing allegations: Lt. Donahue instructed DCF "not to go to the Rose home as the allegation pertained to a Boston police officer." (Am. Compl. ¶ 124). If true, that is sufficient to constitute deliberate indifference, and therefore to satisfy the "shock the conscience" standard. The complete factual context of that instruction will await further development of the evidence. And it is plausible that this instruction caused additional harm to plaintiffs, given that, if DCF had interviewed the children in their home, more aggressive action might have been taken to protect the children.

### c.      Approval of Vacating Restraining Order

The complaint further alleges that defendants Doherty and Hatton "approved of vacating the Restraining Order against Rose," which further "create[d] danger to John Doe and Jane Doe." (Am. Compl. ¶ 170). It alleges that the restraining order was initially issued on November 10, 1995, the same date on which Rose was arrested, and that it ordered "Rose not to contact John Doe, Jane Doe," and two other minors. (Am. Compl. ¶ 122). It further alleges that Rose did not comply with the restraining order and that the "City and BPD Defendants did not investigate or take any action to ensure Rose's compliance" with it. (*Id.* ¶¶ 127-28, 151). The complaint also alleges that the DCF defendants similarly "did not investigate or take any action to ensure Rose's compliance" with the restraining order. (*Id.* ¶ 150). And it alleges that the DCF defendants "consented to the withdrawal of the Restraining Order against Rose" on January 29,

14

1996, and that "[o]n or about February 1 and 8, 1996, respectively, [Doherty] and [Hatton] approved of vacating the Restraining Order against Rose." (*Id.* ¶¶ 152, 170).

The key question as to this issue is whether the Court may properly consider two documents the defendants attached to their motions to dismiss: the abuse-prevention order at issue and a BPD memorandum concerning that order. Plaintiffs contend that doing so would improperly look beyond the face of the complaint, which a court generally may not do without converting the motion into one for summary judgment.[6] Defendants counter that the documents may properly be considered, either because they are official public records or because they are sufficiently referred to in the complaint.

It is hornbook law that "a motion to dismiss under Rule 12(b)(6) generally provides no occasion upon which to consider documents other than the complaint." *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 8 (1st Cir. 2020). There are, however, some limited exceptions to the rule, including "documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiffs' claim; or . . . documents sufficiently referred to in the complaint." *Flores v. OneWest Bank, F.S.B.*, 886 F.3d 160, 167 (1st Cir. 2018) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). Where "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

---

[6] Plaintiffs have moved to strike Exhibits 1 and 2 to the City and BPD defendants' supplemental brief under Fed. R. Civ. P. 12(f). That rule permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). For the reasons discussed below, the Court will deny the motion because it finds that the exhibits are the kind that may properly be considered when ruling on a motion to dismiss under Rule 12(b)(6).

The abuse-prevention order falls squarely within the category of documents that may be considered on a motion to dismiss.  It is clear that the relevant allegations of the complaint are both "expressly linked to" and "dependent upon" that document, and that it is a public record.  As to the latter point, plaintiffs contend that, under Massachusetts law, records of abuse prevention orders in which the plaintiff or defendant is a minor are to be "withheld from public inspection except by order of the court," and are therefore not public records.  *See* Mass. Gen. Laws ch. 209A, § 8.  But the abuse-prevention order does not fall within that restriction, because the plaintiff was Frances Rose, not one of the minor children.  (Dkt. No. 119-1 at 2).  Regardless, it is "sufficiently referred to in the complaint" and may therefore be considered on that basis.

The BPD memorandum stands on a somewhat different footing.  The complaint alleges that defendants Doherty and Hatton "approved of vacating the restraining order against Rose," and that those approvals came on February 1 and 8, 1996, respectively.  (Am. Compl. ¶ 170).  Doherty and Hatton appear to have initialed the BPD memorandum on February 1 and 8, respectively.  (Dkt. No. 119-2 at 2).  Thus, the complaint seems to directly link its allegations to the document.

The BPD memorandum casts some doubt on the question of whether Doherty and Hatton actually approved the vacating of the abuse-prevention order.  It appears to reflect the fact that Robert Dunford, Captain of District 11, wrote to Paul Evans, BPD's commissioner, and James Claiborne, superintendent of the Bureau of Field Services, to inform them that the abuse-prevention order against Rose had been vacated at Frances Rose's request.  (Dkt. No. 119-2 at 3).  The memorandum also indicated that there was "a pending Department of Social Services investigation," and it recommended that Rose be kept on administrative duty until that investigation was complete.  (*Id.*).  The signatures from defendants Doherty and Hatton, then,

16

appear to indicate their approval of the decision to maintain Rose on administrative duty—not their approval of the vacating of the abuse-prevention order. And the order itself indicates that it was vacated at plaintiff's request: it is unclear how or why the police department would have any role in vacating the order under such circumstances.

In any event, and even assuming it can consider the contents of the BPD memorandum, on balance the Court will not dismiss the claim on that basis. At a minimum, the memorandum reflects the fact that the police department was aware that the order was being vacated and took some affirmative step in response. Whether that action contributed to the danger faced by the children, and whether it constituted deliberate indifference and therefore shocks the conscience, is best left to the development of a factual record.

### 2.    DCF Defendants

The First Circuit also reversed the Court's dismissal of the claims against the DCF defendants. In their opposition, plaintiffs identify two affirmative acts as potential bases for state-created danger claims: (1) defendant Smith's "lackluster investigation" of the abuse allegations against Rose, "including interviewing Jane Doe in the presence of Frances Rose," and (2) the "consent" of defendants Adams, Smith, Hilliard, and Sullivan "to the withdrawal of the restraining order despite previously concluding the evidence supported a finding of sexual abuse." (Dkt. No. 126 at 3 (citing Am. Compl. ¶¶ 138-39, 146, 152)). Each will be considered in turn.

### a.    Interview with Jane Doe

The allegations concerning defendant Smith's interview of Jane Doe are similar to those concerning the interview of John Doe by Donahue and MacLean. The complaint alleges that Smith's interview with Jane Doe was inappropriate because it was conducted "only in the presence of Frances Rose." (Am. Compl. ¶ 146). That was inappropriate, plaintiffs contend,

17

because it is plausible that "Frances Rose's presence when Jane Doe" spoke about her abuse by Rose "would . . . enrage and embolden" Rose. (Dkt. No. 126 at 5).

There are some differences between the interview of Jane Doe and the interview of John Doe. The most obvious is that Frances Rose did not herself abuse Jane Doe. The interview of John Doe was particularly egregious because it occurred in view of his abuser; that is not the case for Jane's interview.

Nonetheless, although perhaps a close call, the allegations regarding that incident are sufficient to survive a motion to dismiss. As with the allegations concerning John Doe's interview, the complaint can fairly be read to allege that the circumstances in which Jane Doe was interviewed—in front of her mother, who allegedly helped enable the abuse—were wrongful, even if the act of interviewing Jane Doe was not wrongful in the abstract. (Am. Compl. ¶ 455). And there are no allegations that the DCF defendants had to make quick judgments under exigent circumstances. Under the circumstances, the claim of deliberate indifference as to the potential harms that would potentially befall Jane Doe is sufficient to shock the conscience. And the complaint plausibly alleges that being interviewed in front of Frances Rose caused Jane to suffer more harm than she otherwise would have. (Am. Compl. ¶ 472).

### b.      Consent to Withdrawal of Abuse-Prevention Order

The allegations concerning the withdrawal of the abuse-prevention order are similar to those concerning the BPD defendants' alleged approval of the vacating of the order. The abuse-prevention order itself makes clear that DCF played no role in approving the vacating of the order. It indicates that the order was "vacated at plaintiff's request," and notes that "[plaintiff] said [that she] only wanted order because DSS requested her to do so." (Dkt. No. 121-1 at 3).[7]

---

[7] DSS is the former name of DCF. The opinion will refer to the agency as "DCF" for the sake of clarity.

The document does not indicate that DCF was involved in any way in the decision to vacate the abuse-prevention order, nor do the parties point to any provision of Massachusetts law that would give DCF a role in that decision.

The abuse-prevention order does indicate that DCF played a role in an earlier decision to modify the terms of the restraining order, but the complaint does not allege that the modification caused additional harm to John or Jane Doe, as opposed to the order's eventual vacatur. The order indicates that it was modified on December 20, 1995, at the request of Frances Rose. It states that "[p]ursuant to terms set by DSS[,] defendant may visit children at plaintiff's home so long as she is present." (Dkt. No. 121-1 at 3). It is not clear what precise role DCF played in setting these "terms," nor whether one of the defendants in this action was responsible for doing so. However, the complaint does not include any allegations concerning the December 20, 1995 modification of the restraining order; instead, it discusses only the January 29, 1996 withdrawal of the restraining order. (*See* Am. Compl. ¶ 152).

Nonetheless, the Court will treat the issue as to the role of the DCF defendants in vacating the order in a similar manner as the BPD defendants: it will not dismiss the claim on that basis, but may revisit the question on a fully developed factual record.

### c.      Conclusion

For those reasons, the complaint states a claim for constitutional violations under the state-created danger theory of substantive-due-process liability. That leaves the question of whether the claim is nonetheless barred by the doctrine of qualified immunity.

### 3.      Qualified Immunity

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982).  Qualified immunity is determined according to a two-part test.  *See Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).  The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  *Maldonado*, 568 F.3d at 268-69.

The question is not whether some right has been clearly established at a highly abstract level, but "whether, under the circumstances that confronted the official, 'a reasonable official would understand that what he is doing violated that right.'"  *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "An officer is entitled to qualified immunity if an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate the plaintiffs' rights."  *Johnson v. City of Biddeford*, 92 F.4th 367, 375 (1st Cir. 2024) (citation modified).  The qualified-immunity doctrine "leaves 'ample room for mistaken judgments.'"  *Berthiaume*, 142 F.3d at 15 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

To show that an official's conduct violated a clearly established right, the plaintiff bears the burden "to identify controlling authority or a consensus of persuasive authority sufficient to put the officers on notice that their conduct violated the law."  *Estate of Rahim v. Doe*, 51 F.4th 402, 412 (1st Cir. 2022); *see also Rivera-Corraliza v. Morales*, 794 F.3d 208, 214-15 (1st Cir. 2015) (noting that a plaintiff's failure to identify such authority dooms their claims).  While a prior case need not be identical to clearly establish a right, "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between [improper] and acceptable [conduct]' and thereby provide an officer notice that a specific [act] is unlawful."  *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 18 (2015)).  Qualified

immunity is an affirmative defense, and the burden is on defendants to show they are entitled to its protection. *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001). And qualified immunity may properly "be raised and evaluated on a motion to dismiss." *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011).

As discussed, the complaint alleges several acts that could violate the Fourteenth Amendment under the state-created danger theory of substantive due process. The question, then, is whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Maldonado*, 568 F.3d at 269. This requires analyzing both whether the state-created danger theory was established as a basis for substantive due-process liability in November 1995, as well as whether a reasonable official would have understood that the conduct at issue violated plaintiffs' constitutional rights under that theory. *See Johnson*, 92 F.4th at 375.

In November 1995, there was at least an emerging consensus of persuasive authority that the state-created danger theory could serve as the basis for a substantive due-process violation. As the First Circuit recognized in *Soto v. Flores*, 103 F.3d 1056 (1st Cir. 1997), the state-created danger theory largely derives from *dicta* in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). Although *DeShaney* held that the state does not have a duty to act to protect its citizens from harmful acts by private actors, the Court recognized that the situation could be different if the state had affirmatively acted in some manner. It noted that "[w]hile the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, *nor did it do anything to render him any more vulnerable to them*. . . . [W]hen it returned him to his [abusive] father's custody, it placed him in no worse position than that in which he would have been had it not acted at all." *DeShaney*, 489 U.S. at 201 (emphasis added).

21

Relying on the inverse implication of this dictum—that is, if the state *had* done something to render the plaintiff more vulnerable, it might have been liable—several courts of appeals began to recognize the state-created danger theory in the early and mid-1990s. The First Circuit first addressed the theory in 1992, in a case where it examined the passage from *DeShaney* but found that it did not apply to the facts presented. *See Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 992-93 (1st Cir. 1992). The court suggested that, under certain circumstances, an "'affirmative act' on the part of the state" could "give rise to a *constitutional* . . . duty to protect" a plaintiff. *See id.* at 993.

The First Circuit next addressed the state-created danger theory in *Soto v. Flores*, 103 F.3d 1056 (1st Cir. 1997). In that case, the court again acknowledged that although *DeShaney* "clearly establishes that the state does not have a constitutional duty to protect its citizens from private violence[,] . . . [it] also recognized a distinction between the case before it and other cases in which the state created the risk faced by the plaintiff." *Id.* at 1063. The First Circuit noted that the case before it "arises from the state actor's affirmative acts, which played a part in creating the danger to the [plaintiffs] and rendered them more vulnerable to harm." *Id.* The court cited two other cases, from the Fourth and Second Circuits, that addressed the "alternate framework of § 1983 liability wherein a plaintiff alleges that some conduct by an officer *directly* caused harm to the plaintiff." *Id.* at 1063-64 (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1176 n.* (4th Cir. 1995) (en banc)); *see also Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993). Ultimately, the court declined to decide whether the plaintiff had made out a claim for a constitutional violation under the state-created danger theory, because it found that the existence of that theory was not clearly established as of 1991, when the underlying events occurred. *Soto*, 103 F.3d at 1064-65. Although the theory "ha[d] been recognized by some federal courts as a

22

viable mechanism for establishing a constitutional claim at least since 1979," "in 1991 the First Circuit had not yet addressed the issue of state-created dangers." *Id.* at 1065. The court further noted that the "body of caselaw" interpreting the state-created danger theory was "somewhat confusing" as of 1991, and that it was "more recent judicial opinions that ha[d] begun to clarify the contours of this doctrine," citing to then-recent decisions of the Third and Fourth Circuits. *Id.*

Although *Soto* held that the state-created danger theory was not clearly established as of 1991, it did *not* decide that the theory was not clearly established as of 1997. *Cf. Irish v. Fowler*, 979 F.3d 65, 77 (1st Cir. 2020) (addressing *Soto* in determining whether state-created danger theory was clearly established as of 2015). And, as alluded to by the *Soto* court, by late 1995 a consensus had started to emerge among certain courts that had begun to "clarify the contours of [the] doctrine." *See Soto*, 103 F.3d at 1065.

It appears that the first court to address the doctrine was the Seventh Circuit in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). In that case, police officers stopped a car driven by an adult with three minor children in the back seat. *Id.* at 382. After they arrested the adult (who was the uncle of two of the children) for drag racing, he "pleaded with the officers to take the children to the police station or phone booth so that they could contact their parents," but the officers failed to do so, instead "[leaving] all three children in an abandoned automobile on the side of the road." *Id.* The children eventually had to leave the car and "cross eight lanes of [freeway] traffic" in order to find a telephone. *Id.* The children were eventually retrieved by a neighbor, but the experience caused them "mental pain and anguish." *Id.* The court framed the issue presented in the case as "whether the unjustified and arbitrary refusal of police officers to lend aid to children *endangered by the performance of official duty* violates the constitution

23

where that refusal ultimately results in physical and emotional injury to the children." *Id.* at 383 (emphasis added). The court ultimately concluded that it did, although applying a somewhat different analysis than in later state-created danger cases. *See id.* at 383-86.

The Third Circuit first considered the existence of the state-created danger theory in 1990, but found no violation because the plaintiff "supplied no evidence that [the defendants] acted to create or to exacerbate the danger" she faced from a private individual. *See Brown v. Grabowski*, 922 F.2d 1097, 1116 (3d Cir. 1990). That court considered the issue again in 1992, but again found no liability because the "defendants did not create plaintiffs' peril, increase their risks of harm, or act to render them more vulnerable to the . . . defendants' assaults." *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc). It first upheld a state-created danger claim in 1996. *See Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996).

The Eighth Circuit recognized the theory as early as 1990. *See Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir. 1990) (recognizing that "an affirmative act by a state actor to interfere with the protective services which would have otherwise been available in the community" could serve as basis for substantive due-process claim). The Second Circuit did so as early as 1993. *See Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) ("We read the *DeShaney* Court's analysis to imply that, though an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights."). The Sixth Circuit recognized it as early as 1994. *See Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) ("In *DeShaney*, the Supreme Court went further and stated that a duty to protect can arise in a noncustodial setting if the state

24

does anything to render an individual *more vulnerable* to danger.").  The Tenth Circuit recognized the theory as early as mid-1995.  *See Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995) ("A state also may be liable for an individual's safety under a 'danger creation' theory if it created the danger that harmed that individual.").  The Fourth Circuit recognized the theory's existence in 1995.  *See Pinder v. Johnson*, 54 F.3d 1169, 1176-77 (4th Cir. 1995) (en banc).  And both the Ninth and Eleventh Circuits had recognized the essential outline of the theory in opinions roughly contemporaneous with *DeShaney*.  *See Wood v. Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989); *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 359 (11th Cir. 1989), *overruled in part by White v. Lemacks*, 183 F.3d 1253 (11th Cir. 1999).

These cases show that, by late 1995, there was clear consensus among the courts of appeals that, under some circumstances, affirmative acts by government officials that caused individuals to suffer harm from private actors could constitute substantive due-process violations.  Even if not all these courts had in fact applied the state-created danger theory, they had discussed it and indicated that it could serve as the basis for substantive due-process liability.

That finding alone, however, is insufficient to decide whether defendants are entitled to qualified immunity.  Instead, the Supreme Court has been clear that lower courts should not "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), because allowing qualified immunity to rest on the existence of "extremely abstract rights" would essentially undercut the defense, *see Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  The law is clearly established as to a given action either where the controlling precedent is factually analogous to the case at hand or where an action is "so obviously out-of-bounds that it clearly establish[es] by its own terms a constitutional violation."  *Velez v. Eutzy*, 152 F.4th 292, 303 (1st Cir. 2025).

25

The present factual record, however, is too sparse for the Court to determine whether qualified immunity applies. Although the First Circuit has recognized that qualified immunity may "sometimes . . . be raised and evaluated on a motion to dismiss," *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011), it can be difficult to do so because, "at the outset of litigation, [a court] often cannot tell from a complaint" alone "whether qualified immunity applies," *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022). That is particularly true here, where the complaint includes no allegations of important details concerning the interviews with John and Jane Doe, including how long the interviews with the children lasted and the nature of the parents' presence during these interviews.

For that reason, any decision on whether the defense of qualified immunity applies will have to await the development of a fuller factual record. As a result, defendants' motions to dismiss will be denied as to the state-created danger claims.

**B.** ***Monell***

In addition to its claims against the relevant individuals, the amended complaint also asserts claims against the City of Boston.

A municipality may not be held vicariously liable under § 1983 for the acts of its employees. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (quoting *Monell*, 436 U.S. at 691) (internal citation omitted). In addition, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of

26

an official government policy for purposes of § 1983." *Id.* at 61.  "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (citation modified).  "Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Id.* (citation modified).  Whether a claim is premised on a formal policy, an informal custom, or failure to train, the municipality's action must be the "moving force" behind the underlying constitutional violation for the municipality to be held liable under § 1983. *See Wadsworth v. Nguyen*, 129 F.4th 38, 66 (1st Cir. 2025).

The amended complaint sets out two theories under which the City could be held liable. The first, set out in Count 1, is that the City had a policy or custom that caused plaintiffs' injuries.  The second, set out in Count 2, is that the City failed to adequately screen, train, and supervise its police officers, and that failure caused the plaintiffs' injuries.

### 1.    Policy or Custom

First, the amended complaint alleges that the Police Department had a custom of inadequately or inappropriately investigating misconduct complaints involving BPD officers. The complaint specifically alleges that the City had a policy of "inadequately investigat[ing], respond[ing], report[ing], document[ing], and discplin[ing] misconduct of police officers"; of "tolerat[ing] misconduct and violations of departmental rules"; and of "allow[ing] inappropriate and unchecked disciplinary determinations." (Am. Compl. ¶¶ 285, 287-88).  And the findings of the St. Clair Report, which is referred to in the complaint, concerning misconduct within BPD raise those allegations to the level of plausibility.[8]

---

[8] It is true that this case does not fit neatly within the practices laid out in the St. Clair Report, which generally involved BPD completely ignoring or sweeping under the rug allegations of police misconduct.  Here,

Furthermore, the complaint adequately alleges that the City's custom was the "moving force" behind plaintiffs' injuries.  The complaint, relying on the St. Clair Report, details the history of BPD inadequately investigating allegations of misconduct involving police officers. (Am. Compl. ¶¶ 261-66).  And it is plausible that this custom of inadequate investigation was the reason why the officers interviewed John Doe in view of Patrick Rose—which, as laid out above, is what could plausibly constitute a constitutional violation under the state-created danger theory.

Accordingly, the amended complaint states a claim under *Monell* based on its allegations concerning the City's custom of inadequately investigating misconduct complaints involving police officers.

### 2.    Failure to Train

The complaint further alleges that BPD failed to train its officers concerning investigations of sexual abuse involving BPD officers, and that the failure was a moving force behind the violations of plaintiffs' constitutional rights.

The complaint alleges, among other things, that the City failed to train police officers on "how to appropriately investigate complaints of misconduct against police officers"; "how to appropriately investigate complaints of sexual assault by police officers"; and "how to appropriately investigate and follow up on DCF findings and complaints against police officers." (Am. Compl. ¶¶ 299-301).  And such failures were the "moving force" behind plaintiff's injuries: as discussed above, the state-created danger claims arose from the officers' decision to interview the plaintiffs in front of Patrick and Frances Rose, as well as the decision to tell DCF "not to go

---

Rose was investigated and the complaint against him was sustained by IAD—but Rose was placed back on active duty after the Doe plaintiffs recanted their allegations (under pressure, they contend).  Nonetheless, it is at least plausible that the custom or policy contributed to the harm to plaintiffs.

28

to the Rose home, as the allegation pertained to a Boston Police officer." (Am. Compl. ¶¶ 117-19, 124, 146).

However, the complaint does not sufficiently allege that the City acted with deliberate indifference, as required to state a claim under *Monell* based on failure to train. As noted above, a municipal defendant's failure to train its employees only violates § 1983 where it amounts to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick*, 563 U.S. at 61 (quoting *City of Canton*, 489 U.S. at 388) (citation modified). The standard is a "stringent" one, and ordinarily requires demonstrating that "policymakers were aware of, and acquiesced in, a pattern of similar constitutional violations by untrained employees." *Conlon v. Scaltreto*, 158 F.4th 211, 224 (1st Cir. 2025). In "a narrow range of circumstances," a failure-to-train claim can be predicated on a single incident, but only where "the plaintiff can establish that a constitutional violation was a 'highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Id.* (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 28 (1st Cir. 2005)). That exception is a narrow one, and the Supreme Court has suggested that it applies only in particularly obvious and egregious circumstances:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference to constitutional rights."

*City of Canton*, 489 U.S. at 390 n.10 (citation omitted).

The complaint does not allege that the City had previously been confronted with circumstances similar to those that led to the constitutional violation here—for example, where alleged victims of sexual abuse by BPD officers should be interviewed—and plaintiffs therefore

29

must satisfy the single-incident exception to state a § 1983 claim based on failure to train.  And although it would certainly have been desirable for the City to have better trained its officers on how to conduct these investigations, its failure to do so does not rise to the same level as failing to train police officers on basic use-of-force principles, *see City of Canton*, 489 U.S. at 390 n.10, or failing to train officers on how to avoid friendly fire when a police department had a policy requiring officers to remain armed and respond to incidents even when off duty, *see Young*, 404 F.3d at 16, 28-29.  Accordingly, the complaint fails to plausibly allege that the City acted with deliberate indifference. [9]  As a result, the complaint fails to state a claim against the City based on its failure to train its police officers, and Count 2 will therefore be dismissed.

### C.      Remaining State-Law Claims

In addition to the federal constitutional claims, the amended complaint includes a number of state-law claims, including for violation of the Massachusetts Civil Rights Act, negligence, and intentional and negligent infliction of emotional distress.

At a status conference held following remand from the Court of Appeals, the Court indicated that the parties should address only the federal constitutional claims in their supplemental briefs, and that the state-law claims should await resolution of those claims, because the Court would likely decline to exercise supplemental jurisdiction over the state-law claims if the federal claims were dismissed.

Because some of the federal claims will be permitted to proceed, the Court must address the state-law claims.  And although many of the parties addressed those claims in their initial

---

[9] Count 2 also includes an allegation that "[t]he City and BPD Defendants failed to screen police officers for prior misconduct including prior allegations of neglect, abuse, and sexual assault."  (Am. Compl. ¶ 298).  However, as the Court already held, and plaintiffs did not challenge on appeal, Rose was not acting under color of law when he abused John and Jane.  *See Doe v. City of Boston*, 2024 WL 1346018, at *11 (D. Mass. Mar. 29, 2024).  Accordingly, the City's failure to adequately screen Rose before employing him as a police officer could not have caused a constitutional injury to John and Jane.

motions, they were not the focus of those motions, and the parties devoted relatively little space to what are, in some cases, fairly complex issues.  In addition, because the DCF defendants did not file their motion to dismiss until after the case had been remanded, they have not addressed the state-law claims at all.

Therefore, although cognizant of the potential for additional delay, the Court will defer ruling on the motions to dismiss the state-law claims until the parties have had an opportunity to file supplemental briefs as to those issues.  The Court will set a briefing schedule and address the topic of discovery in a future order.

## IV.    **Conclusion**

For the foregoing reasons, the motions to dismiss are DENIED as to the state-created danger claims.  The City's motion to dismiss (Dkt. No. 28) is GRANTED as to Count 2 of the complaint.  Plaintiffs' motions to strike (Dkt. Nos. 122 and 124) are DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  August 14, 2026                    United States District Judge